**Peggy GRUCA, formerly known as Peggy Poole, individually and as Administrator of the Estate of Stephen Poole, Deceased, Plaintiff,**

v.

**ALPHA THERAPEUTIC CORPORATION, a foreign corporation, and The Green Cross Corporation, a Japanese corporation, Defendants.**

No. 86 C 7623.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 3, 1998.

863

William J. Harte, Joan M. Mannix, William
J. Harte, Ltd., Chicago, IL, Debra Ann
Thomas, Chicago, IL, for Peggy Gruca.

Martha D. Owens, Wildman, Harrold, Allen & Dixon, Chicago, IL, Edwin W. Green, Bronson & McKinnon, Los Angeles, CA, Fred H. Bartlit, Jr., Lindley J. Brenza, Bartlit, Beck, Herman, Palenchar & Scott, Chicago, IL, David I. Bell, Knapp, Petersen & Clarke, P.A., Glendale, CA, Adam L. Hoeflich, Shawn Fagan, Bartlit Beck Herman Palenchar & Scott, Chicago, IL, for Alpha Therapuetic Corp.

## MEMORANDUM OPINION AND ORDER

GOTTSCHALL, District Judge.

In her Fifth Amended Complaint, plaintiff Peggy Gruca seeks to add a new defendant, The Green Cross Corporation ("Green Cross"). Green Cross has made a limited appearance to move to dismiss the Fifth Amended Complaint for lack of personal jurisdiction. For the reasons set forth below, the motion is granted.

### BACKGROUND[1]

Gruca filed this action on behalf of herself, her two minor children, and the estate of her late husband, Stephen Poole against four defendants. Poole was a hemophiliac with a severe deficiency of Factor VIII in his plasma. Factor VIII is a protein necessary for clotting. Poole used a commercially prepared product called Factor VIII concentrate, which was prescribed by his doctor, to treat bleeding episodes. The defendants allegedly manufactured the Factor VIII concentrate used by Poole.

In 1986, Poole was diagnosed with AIDS, and he died in 1987. Plaintiff brought this action asserting a variety of negligence claims against the defendants for their failure to minimize the risks of transmitting viruses, including the virus that causes AIDS, through the Factor VIII concentrate. At the close of a seven-week trial in 1993, a jury returned a verdict in favor of the defendants and the district court entered judgment for defendants. On appeal, plaintiff's

motion for a new trial was granted. The case was eventually transferred to this court.

Three of the four defendants in the 1993 trial settled with plaintiff. Alpha Therapeutic Corporation ("Alpha") was the only one of the four defendants that did not reach a settlement. Plaintiff filed a Fifth Amended Complaint ("the Complaint") against Alpha. The Complaint also named Green Cross as a defendant for the first time. Green Cross is a foreign corporation organized under the laws of Japan and is the parent corporation of Alpha.[2]

Alpha was established by Green Cross in 1978. Green Cross acquired the Abbott Scientific Products Division (ASPD) from Abbott Laboratories, Inc. in 1978 and transferred the assets of ASPD directly to Alpha. Alpha collects plasma from donors and manufactures and sells products made from human plasma.

In the Complaint, plaintiff alleges that Green Cross and Alpha were negligent in collecting plasma and manufacturing Factor VIII concentrate. Although the Complaint alleges that both Green Cross and Alpha committed the various negligent acts, it is clear from her briefs on the motion to dismiss that plaintiff is not contending that the actions of Green Cross alone are sufficient to provide this court with personal jurisdiction. From the Complaint and the briefs, it appears that Alpha collected plasma from donors and manufactured and sold Factor VIII concentrate in Illinois and that Alpha allegedly sold the Factor VIII that infected Poole with HIV. Plaintiff claims that Green Cross' involvement with Alpha is sufficient to establish personal jurisdiction over Green Cross. In particular, plaintiff argues that Alpha is the alter ego of or was substantially controlled by Green Cross, or alternatively, that Alpha and Green Cross were joint venturers.

### DISCUSSION

 A federal district court in Illinois has personal jurisdiction over a nonresident

---

1. The background is taken from the Fifth Amended Complaint and from the Seventh Circuit's opinion in this action, *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638 (7th Cir.1995).

2. It appears that as of 1994, a new corporation, Green Cross Corporation of America, was the parent corporation of Alpha. Green Cross Corporation of America is wholly owned by Green Cross.

party only if an Illinois state court would have jurisdiction. *Michael J. Neuman & Assoc. v. Florabelle Flowers, Inc.*, 15 F.3d 721, 724 (7th Cir.1994). On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing a prima facie case of personal jurisdiction. *Id.* In deciding a motion to dismiss for lack of personal jurisdiction, a court may receive and consider affidavits from the parties. *Hedge Assoc. v. Ferraz Corp.*, No. 95 C 4042, 1996 WL 37680, at \*1 (N.D.Ill. Jan.26, 1996). Factual disputes must be resolved in favor of the plaintiff. *Id.* The plaintiff must show that Illinois law permits jurisdiction and that the exercise of jurisdiction will not offend due process. *IDS Life Ins. Co. v. SunAmerica, Inc.*, 958 F.Supp. 1258, 1264 (N.D.Ill. 1997), *vacated in part*, 136 F.3d 537 (7th Cir.1998).

■ The Illinois long-arm statute permits the exercise of jurisdiction over claims arising out of the defendant's transaction business or commission of a tort in Illinois. 735 ILCS 5/2–209(a)(1) and (2). The statute also permits jurisdiction over a "corporation doing business" in Illinois. 735 ILCS 5/2–209(b)(4).

Here, plaintiff does not contend that Green Cross itself engaged in the transactions or committed the torts giving rise to the claims. Likewise, plaintiff does not assert that Green Cross itself is doing business in Illinois. It is undisputed that Green Cross itself has not marketed or sold blood products in Illinois and has not collected or processed plasma in Illinois. Green Cross itself does not conduct any business in Illinois, manufacture or sell any products in Illinois, or have any employees in Illinois. Instead, plaintiff argues that Green Cross' involvement with Alpha is sufficient to permit this court to exercise personal jurisdiction over Green Cross.[3] In particular, plaintiff argues that jurisdiction over Green Cross is proper (1) because Alpha is the alter ego of Green Cross or is at least substantially controlled by Green Cross; or, alternatively, (2) because Alpha and Green Cross are joint venturers. There is no dispute that this court has jurisdiction over Alpha. Therefore, to determine if Green Cross is within this court's jurisdiction, it is necessary to examine the relationship between Green Cross and Alpha.

### I. *Alpha as Alter Ego of or Substantially Controlled by Green Cross*

■ Jurisdiction over a subsidiary is not sufficient to confer jurisdiction over an out-of-state parent. *IDS*, 958 F.Supp. at 1265–66. When a subsidiary is doing business in Illinois, the mere existence of a parent-subsidiary relationship does not enable a court to exercise jurisdiction over a foreign parent. *Id.* Instead, the party arguing for jurisdiction must allege something more than the existence of the parent-subsidiary relationship and that the subsidiary is doing business in Illinois.

Courts have not developed a bright-line test for determining when it is appropriate to exercise jurisdiction over a parent corporation based upon the activities of its subsidiary. In *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), the Supreme Court considered whether a subsidiary's activities in North Carolina could establish that the parent corporation was doing business in North Carolina. The Court framed the issue as "whether the corporate separation carefully maintained must be ignored in determining the existence of jurisdiction." *Id.* at 336, 45 S.Ct. 250. In holding that the parent was not subject to jurisdiction in North Carolina,

---

3. In 1989, Illinois amended its long-arm statute to permit Illinois courts to exercise jurisdiction "on any basis permitted by the Illinois Constitution and the United States Constitution." 735 ILCS 5/2–209(c). After this amendment, a court need only ensure that jurisdiction satisfies constitutional due process standards. However, this action was filed in 1986, before the amendment to the long-arm statute. Further complicating matters, plaintiff did not attempt to add Green Cross as a defendant until 1996. Thus, it is unclear if plaintiff could rely on 735 ILCS 5/2–209(c) to assert jurisdiction on some basis other than one specifically provided in the long-arm statute. The question is merely academic, as plaintiff has not attempted to rely on 735 ILCS 5/2–209(c). Instead, plaintiff has relied on a line of cases, discussed *infra*, that has found that a parent corporation is "doing business" in Illinois if it substantially controls the operations of a subsidiary doing business in Illinois.

the Court noted that "[t]he corporate separation, though perhaps merely formal, was real. It was not pure fiction." *Id.* at 337, 45 S.Ct. 250.

The continuing validity of *Cannon* is in doubt. *See Gantzert v. Holz–Her U.S., Inc.,* No. 94 C 0529, 1994 WL 532134, at *4 n. 4 (N.D.Ill. Sept. 28, 1994); *see generally,* Daniel G. Brown, *Jurisdiction over a Corporation on the Basis of the Contacts of an Affiliated Corporation: Do You Have to Pierce the Corporate Veil?,* 61 U.Cin.L.Rev. 595 (1992); Lea Brilmayer & Kathleen Paisley, *Personal Jurisdiction and Substantive Legal Relations: Corporations, Conspiracies and Agency,* 74 Calif.L.Rev. 1 (1986). Since *Cannon* was decided, the constitutional standards for exercising jurisdiction have been drastically revised.[4] Most importantly, the "physical presence" test has been replaced by the "minimum contacts" standard. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Thus, in more recent years, courts deciding personal jurisdiction issues have looked at the "real" rather than the "formal" relationship between the parent and the subsidiary. *See, e.g., Gantzert,* 1994 WL 532134, at *4 n. 4.

Illinois courts appear to use two approaches in examining whether the activities of the subsidiary give rise to jurisdiction over the parent. Under one approach, Illinois courts examine whether the parent and subsidiary have maintained formal separation and observed corporate formalities. If not, then the corporate veil of the subsidiary may be pierced, the activities of the subsidiary may be attributed to the parent, and the court may exercise jurisdiction over the parent. This approach is consistent with *Cannon's* emphasis on the formal relationship between parent and subsidiary. However, Illinois courts have also shown a willingness to employ a more flexible approach that examines the nature of the activities by the subsidiary and the degree of control exer-

cised by the parent over the subsidiary. These approaches are examined in more detail below.

### A. Tests for Piercing the Corporate Veil and Substantial Control

As noted above Illinois courts seem to recognize two methods by which a plaintiff can establish jurisdiction over a foreign parent corporation based on the activities of its subsidiary. First, the party alleging jurisdiction can provide evidence that justifies piercing the corporate veil of the subsidiary. *See IDS,* 136 F.3d at 540 (noting that parent corporations not liable for subsidiaries' tortious acts and not subject to jurisdiction under tort provision of long-arm statute "unless there is a basis for piercing the corporate veil"). In Illinois, a corporation's veil may be pierced only if (1) there is such "unity of interest and ownership that the separate personalities of the corporation" and the subsidiary no longer exist; and (2) "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Hystro Prods., Inc. v. MNP Corp.,* 18 F.3d 1384, 1388–89 (7th Cir.1994) (quoting *Van Dorn Co. v. Future Chem. and Oil Corp.,* 753 F.2d 565, 569–70 (7th Cir.1985)). To determine if there is a sufficient "unity of interest and ownership" between two corporations to justify piercing the veil, Illinois courts look to four factors: "(1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another as its own." *Van Dorn,* 753 F.2d at 570.

Second, a plaintiff can establish jurisdiction over a parent corporation by showing that the parent substantially controls the activities of a subsidiary doing business in Illinois. *IDS,* 958 F.Supp. at 1266–67; *Integrated Bus. Info. Serv. (Proprietary) Ltd. v. Dun & Bradstreet Corp.,* 714 F.Supp. 296,

---

**4.** The Supreme Court explicitly stated that "[n]o question of the constitutional powers of the state, or of the federal government, is directly presented." *Cannon,* 267 U.S. at 336, 45 S.Ct. 250. Thus, *Cannon* never purported to set out the constitutional limits for when jurisdiction may be

exercised over a parent corporation based on the activities of its subsidiary. Instead, the decision seemed to rest on principles of the law of corporations. *See* Brown, *supra,* at 602; Brilmayer & Paisley, *supra,* at 2.

300–01 (N.D.Ill.1989). In both *IDS* and *Integrated Business,* the courts looked to an Illinois Supreme Court case, *Maunder v. De-Havilland Aircraft of Canada, Ltd.,* 102 Ill.2d 342, 80 Ill.Dec. 765, 466 N.E.2d 217 (1984), in which the Court found jurisdiction over a foreign parent because the subsidiary was conducting the business of the parent rather than its own business in Illinois.[5] Though it was decided prior to *Maunder,* the opinion in *Graco, Inc. v. Kremlin, Inc.,* 558 F.Supp. 188 (N.D.Ill.1982) identifies several factors to consider in determining if a parent is so closely linked to its subsidiary that jurisdiction over the subsidiary creates jurisdiction over the parent:

> [W]hether the parent arranges financing for and capitalization of the subsidiary; whether separate books, tax returns and financial statements are kept; whether officers or directors are the same; whether the parent holds its subsidiary out as an agent; the method of payment made to the parent by the subsidiary; and how much control is exerted by the parent over the daily affairs of its subsidiary.

*Id.* at 191.

Plaintiff contends that she has provided sufficient evidence to establish jurisdiction under either method. After examining plaintiff's allegations and evidence in support of jurisdiction, the court will return to the factors set out in *Van Dorn* and *Graco.*

B. *The Relationship Between Green Cross and Alpha*

█ Plaintiff argues that numerous factors indicate substantial control by Green Cross over Alpha.[6] Plaintiff contends that Green Cross acquired the assets of ASPD (and transferred the assets to Alpha) in order to ensure that Green Cross would have an adequate supply of plasma and blood products. A substantial portion of Alpha's sales are to

Green Cross. As of 1980, 79.7 percent of Alpha's income from net sales was derived from sales to Green Cross. (Compl.¶ 14.) However, plaintiff offers no evidence that these sales were anything other than ordinary, market-rate contractual sales.

Plaintiff maintains that Green Cross used Alpha as an instrument to expand Green Cross' international operations. Plaintiff cites to "The Green Cross Corporation Annual Report 1982," which stated in part:

> Our key overseas operation is Alpha Therapeutic Corporation (ATC), a wholly owned subsidiary in the United States. Until 1978, when we established ATC, our prospects for sustaining growth were hampered by a shortage in the domestic supply of plasma. Since then, ATC has steadily provided various blood products and semiprocessed materials, meeting approximately 80 percent of our needs for these products. Last year, ATC's sales rose 16 percent and profits have continued to climb.
>
> ATC is also being used to expand our international marketing efforts. In August 1978 ATC established Alpha GmbH in Germany. In addition, ATC acquired in October 1982 a 50 percent interest in Laboratorios Grifols S.A. of Spain, and supplied manufacturing technology for the production of plasma products. This arrangement has further strengthened our marketing position for plasma products in Europe.

(Pl's Resp., Ex. D at 2.) However, as Green Cross points out, the report clearly identifies Alpha as a separate entity from Green Cross, refers to sales and profits by Alpha, and describes Alpha's expansion in Europe. The ambiguous references to *"[o]ur* key overseas operation," *"our* international marketing efforts" and *"our* marketing position" are con-

---

5. In practice, the "piercing of the corporate veil" approach and the "subsidiary substantially controlled by the parent" approach are not always treated as distinct. Here, the parties for the most part have treated them as part of the same inquiry. Nevertheless, the Illinois Supreme Court regarded the approaches as distinct and so will this court. *See Maunder,* 466 N.E.2d at 223, 80 Ill. Dec. at 771 ("Since we have determined that [the parent] was doing business in Illinois,

we need not address the alternative theory of whether [the parent] was the alter ego of [the subsidiary].").

6. Plaintiff relies on many of the same factors to support its argument for piercing the corporate veil and treating Alpha as the alter ego of Green Cross.

sistent with Alpha's existence as a separate entity. They do not show that Alpha exists merely as an instrument for marketing and selling Green Cross' products. As the court said in *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, No. 86 C 371, 1989 WL 165070, at *2 (N.D.Ill. Dec. 29, 1989): "It is an economic fact of life that subsidiaries are subject to the overall direction of the parent, with a unity of interest and common objectives. . . ."

Plaintiff contends that "Green Cross dictated the markets into which Alpha could sell." (Pl's Supp.Resp. at 8.) However, at best, the deposition testimony cited offers limited support for this assertion. Plaintiff refers to the deposition testimony of Alpha's former president and CEO, Samuel Dale Anderson, Sr., who stated that "[w]hen I got to Alpha we had a very small percentage of the business in Europe. We wanted to be— we didn't want the Green Cross to take that responsibility away from us so we put a lot of effort into Europe and dramatically increased our market share." (Pl's Resp., Ex. B at 51.) At most, this testimony indicates a fear that Green Cross would act to reduce Alpha's presence in the European market. It does not establish that Green Cross ever exercised control over Alpha's marketing in Europe or elsewhere.

Plaintiff also claims that Green Cross exercised control over Alpha's budget. The testimony cited by plaintiff indicates that Green Cross engaged in some oversight of the budget. Anderson testified that

Q: Does Green Cross have authority to veto any aspect of Alpha's submitted budget?

\* \* \* \* \* \*

A: I guess they do. They own the company. If they wanted to veto some part of the budget.

Q: Has that situation ever happened since—during the time that you were president?

A: I don't ever recall Green Cross vetoing part of the budget.

Q: Have they ever failed to approve any part of a budget that you have submitted?

A: You have to understand the budget's process. It's a negotiated discussion when you go.

Q: I see.

A: You don't go in and say this is what we're going to do. You say this is what our plan is, let's discuss it, and you sit around with 25 different people in the budget—literally 25 people.

Q: And was it your job as president to present the budget for negotiation?

A: It was my job to take a team over there and supervise the presentation of the budget.

(Pl's Resp., Ex. B at 68–69.) Thus, it appears that Alpha's president submitted a proposed budget and discussed it with Green Cross. However, this is rather slight evidence of Green Cross' purported "substantial control" over Alpha. Green Cross required its wholly owned subsidiary to present a budget plan. There is no evidence that Green Cross played any role in creating the initial budget proposal or that Green Cross ever vetoed any of the proposed budget. At most this suggests oversight by Green Cross over its investment in Alpha.

Plaintiff asserts that Green Cross' 1982 Annual Report also indicates that Green Cross failed to maintain separate financial statements for Green Cross and Alpha. The 1982 report specifies that it contains "consolidated financial statements [that] include the accounts of Green Cross, Alpha Therapeutic Corporation ("Alpha" a wholly-owned U.S. Corporation) and Alpha's subsidiary in Germany." (Pl's Resp., Ex. D at 11.) However, this indicates only that the separate financial statements of Green Cross and Alpha were consolidated for the purposes of the annual report. The annual report itself makes clear that Alpha maintains its own separate financial statements. (*See* Pl's Resp., Ex. D at 20.) Green Cross and Alpha have provided affidavits stating that they do not commingle finances or share assets. (Def's Mem., Ex. B ¶ 13; Def's Mem., Ex. C ¶ 9.)

Plaintiff also argues that substantial overlap between the officers and directors of Alpha and Green Cross provides further evidence of Green Cross' control over Alpha.

Plaintiff notes that a majority of Alpha's Board of Directors were also members of Green Cross' Board of Directors.[7] Plaintiff also argues that Green Cross "monitored Alpha's internal affairs through liaisons, who monitored both Alpha's finances and research and development." (Pl's Supp.Resp. at 8.) However, plaintiff does not assert that these liaisons controlled the operations of Alpha—indeed, plaintiff claims only that the liaisons "monitored" Alpha's operations.

Finally, plaintiff notes that Alpha and Green Cross collaborated on research and development programs.[8] For one product, Green Cross developed the product and conducted animal studies. Alpha performed quality control testing, found people for preclinical studies, and, later, conducted the clinical studies on the product. The product was eventually licensed by the Food and Drug Administration (FDA), and Alpha's former Vice–President of Regulatory Affairs did much of the work in connection with obtaining the FDA license. In addition, some Green Cross employees came to the United States to work with Alpha's research and development department.

### C. Examining the Relationship in Light of the Factors in Van Dorn and Graco

Looking first at the factors set out in *Van Dorn*, it is clear that plaintiff has failed to establish that Alpha and Green Cross have sufficient "unity of interest and ownership" to justify piercing the corporate veil. The four factors are (1) the failure to maintain adequate corporate records or to comply with corporate formalities; (2) the commingling of funds or assets; (3) undercapitalization; and (4) one corporation treating the assets of another as its own. *Van Dorn*, 753 F.2d at 570.

The only evidence of factors (1) and (2) is Green Cross' 1982 Annual Report, which contained a consolidated financial statement.

However, as noted above, the report itself made clear that Alpha does maintain its own financial statements, and there is no evidence that Alpha failed to maintain adequate records or comply with corporate formalities. Plaintiff claims that Alpha is undercapitalized based upon the statement by the former president of Alpha, Thomas Drees, that after Green Cross bought Alpha it put a lot of money into Alpha. (Pl's Resp., Ex. C at 2748.) In response, Green Cross offers affidavits stating that "Green Cross has not funded, and does not fund, Alpha." (Def's Mem., Ex. C ¶ 9.) Even if this court were to find that the vague statement by Drees is sufficient to create a factual conflict (which must be resolved in favor of plaintiff) as to whether Green Cross funded Alpha, Drees' statement is insufficient to establish undercapitalization. There is no evidence that the assets of Alpha are insubstantial or that funds are transferred to and from Alpha when necessary to meet current obligations. *See Van Dorn*, 753 F.2d at 571–72. Indeed, the only evidence provided by plaintiff indicates that Green Cross transferred funds to improve the capitalization of Alpha, intending to assist Alpha's transition to self-sufficiency. Finally, there is little, if any, evidence of Green Cross treating the assets of Alpha as its own assets. A high proportion of Alpha's sales may have been to Green Cross, but there is no evidence that these sales were anything other than market-rate transactions. There is no evidence that Green Cross transferred assets to and from Alpha without regard to the corporate forms. The only evidence suggesting that Green Cross may have used its control over Alpha to impose some obligations on Alpha is the allegation that Green Cross required Alpha to perform some research and development on products created by Green Cross. However, the nature of this research and development cooperation is ill-defined, and, in the absence of some evidence on the other factors set out

---

7. The current composition of the Alpha board is not clear from the papers.

8. Plaintiff argues that there is "a direct connection between Green Cross' control over Alpha and the issues involved in this litigation." (Pl's Resp. at 9.) Plaintiff contends that the Green Cross Board and Green Cross' liaison in charge

of coordinating research and development did not discuss with Alpha a Green Cross process that could have made Factor VIII safer. (Id. at 9–10.) However, plaintiff nowhere explains how this is relevant for establishing that this court has jurisdiction over Green Cross.

in *Van Dorn*, it is inadequate to justify piercing the corporate veil.

Turning now to the question of whether Green Cross exercised sufficient control over Alpha to create jurisdiction over Green Cross, the court will examine the evidence in light of the factors set out in *Graco*. As noted above, *Graco* set out several factors to consider when determining if the parent should be viewed as doing business through the subsidiary:

(1) Whether the parent arranges financing for and capitalization of the subsidiary;

(2) Whether separate books, tax returns and financial statements are kept;

(3) Whether officers or directors are the same;

(4) Whether the parent holds its subsidiary out as an agent;

(5) The method of payment made to the parent by the subsidiary; and

(6) How much control is exerted by the parent over the daily affairs of its subsidiary.

*Graco*, 558 F.Supp. at 191.

Other than the vague statement that Green Cross put a lot of money into Alpha, there is no evidence that Green Cross arranges financing or capitalization for Alpha. Plaintiff cited to the consolidated financial statements in the 1982 annual report, but even that report indicated that Alpha maintains its own financial records. There is no other evidence that Green Cross does not keep its own books, tax returns and financial statements. Plaintiff has provided no evidence that Green Cross holds Alpha out as its agent. Finally, plaintiff has not shown that the method of payments between Alpha and Green Cross suggests that Alpha is merely an instrument of Green Cross.

To support her contention that Green Cross dominates Alpha, plaintiff relies primarily on the third and the sixth factors. A majority of Alpha's directors were also directors of Green Cross. While such overlap provides some evidence of control (or at least the potential for control), on its own it is not sufficient. As noted in *IDS*, "the 'overlap of executives and directors' between the parent and subsidiary ... 'does not approach the level of control' required to vest the court with jurisdiction." 958 F.Supp. at 1266 (quoting *Integrated Bus.*, 714 F.Supp. at 300). Plaintiff notes that the until his death in 1983, the president of Green Cross often came to the United States for Alpha's board meetings. However there is little evidence that officers at Green Cross exerted substantial control over Alpha, and in particular, over the "daily affairs" of Alpha. Though plaintiff makes numerous allegations that Green Cross controlled Alpha, she has provided insufficient evidence of such control. Plaintiff notes that Green Cross kept liaisons at Alpha, but there is no evidence that the liaisons exerted any control over the operations at Alpha. Indeed, plaintiff alleges only that the liaisons "monitored" Alpha's operations. Plaintiff's assertion that Green Cross controlled Alpha's marketing is not supported by the evidence. Plaintiff has provided evidence that Alpha had to present a budget to Green Cross, but this appears to be little more than oversight. There is no evidence that Green Cross was involved in the preparation of the budget or that Green Cross exercised a veto over the budget.

Plaintiff has failed to establish that Green Cross exerted substantial control over Alpha. Green Cross created Alpha to ensure that Green Cross would have an adequate supply of plasma, and a large percentage of Alpha's sales have been to Green Cross. There is substantial overlap between the boards of directors. Green Cross and Alpha have cooperated on some research and development. Nevertheless, Alpha has maintained a separate corporate existence. Alpha appears to maintain control over its daily operations and has not operated as a mere instrument of Green Cross. Green Cross is not doing business in Illinois through Alpha.

This conclusion is consistent with other cases that have examined when the activities of the subsidiary may give rise to jurisdiction over the parent. In both *Integrated Business* and *IDS*, the courts found that the parent corporations did not control the operations of the subsidiaries to a degree that would permit the court to exercise jurisdiction over the parents. The courts noted that

overlap of executives and directors was insufficient and that plaintiffs had failed to provide evidence that the parents maintained control over the everyday operations of the subsidiaries. *IDS*, 958 F.Supp. at 1266; *Integrated Bus.*, 714 F.Supp. at 300–01. The court in *Integrated Business* distinguished two Illinois state court decisions in which parent corporations had been found to be "doing business" in Illinois through their subsidiaries:

> [I]n *Maunder*, the parent corporation was a Canadian aircraft manufacturer, while the wholly owned subsidiary was a Delaware corporation with its principal place of business in Illinois. The subsidiary's sole business was the sale of the parent's aircraft parts, and the parent had included the subsidiary in its advertisement in American aviation journals. In addition, the subsidiary's operating manual stated that the subsidiary was controlled by the parent and operated under the parent's Vice President of Sales. 80 Ill.Dec. 765, 466 N.E.2d at 219. Under the circumstances of the case, the Illinois Supreme Court concluded that the parent was "[c]learly ... doing business in Illinois." *Id.* at 222.

> Similarly, in *Schlunk v. Volkswagenwerk Aktiengesellschaft*, 145 Ill.App.3d 594, 105 Ill.Dec. 39, 503 N.E.2d 1045 (1986), *aff'd on other grounds*, 486 U.S. 694, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988), the parent was the German automobile manufacturer ("VWAG") and the subsidiary ("VWoA") was the exclusive importer and distributor of VWAG products sold in the United States. Technically, the question is *Schlunk* was not whether VWAG was subject to the jurisdiction of the court, but whether service on VWoA constituted valid service on VWAG. However, the court noted that the jurisdiction and the service issues both turned on whether the parent was doing business in Illinois, and the "an-

swer to this question usually depends upon the relationship between parent and subsidiary." *Id.* at 1049. VWoA was concededly doing business in Illinois, and the Illinois Appellate Court concluded that VWAG was doing business in Illinois by virtue of its relationship with VWoA. In reaching this conclusion, the Court relied, inter alia, on the following facts:

> VWoA has bound itself to sell VWAG's products within its territory and to maintain and repair VWAG's automobiles regardless of where they were sold. VWAG is empowered to terminate the importer agreement without prior notice if VWoA experiences business or financial difficulties. VWAG controls VWoA's choice of dealers, the designation of VWoA's products and services, stock levels, and methods of ordering. In addition, it dominates the VWoA Board and often conducts VWoA board meetings in its own domicile. VWoA is required by contract to keep VWAG apprised of all aspects of its business, and is authorized to prosecute trademark infringement suits in VWAG's name. *Id.* at 1053.

*Integrated Bus.*, 714 F.Supp. at 300.

As in *Integrated Business* and *IDS*, plaintiff here has not produced evidence of the type of control of the parent over the subsidiary like that present in *Maunder* and *Schlunk*. Moreover, as the above quote from *Integrated Business* makes clear, a crucial factor in the Illinois court decisions in *Maunder* and *Schlunk* was that in each case, the subsidiary's business was the marketing, sale, or servicing of the parent's products in Illinois.[9] In contrast, Alpha does not market, sell, or service Green Cross' products in Illinois. Though a large percentage of Alpha's sales go to Green Cross, Alpha does not exist solely for the purpose of selling products to Green Cross.[10] Green Cross does not sub-

9. Indeed, the *Maunder* case could be read as a variation of the principle that a corporation may be subject to jurisdiction where it "delivers its products into the stream of commerce with the expectation that will be purchased by consumers in the forum State." *Gantzert*, 1994 WL 532134, at *3 (quoting *World–Wide Volkswagen Corp. v.*

*Woodson*, 444 U.S. 286, 297–98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

10. Plaintiff has pointed to no case, and this court has located no case, in which jurisdiction was premised on the fact that all or virtually all of a subsidiary's sales went to the parent. As noted above, in the Illinois cases finding jurisdiction

stantially control the operations of Alpha. Accordingly, this court lacks jurisdiction over Green Cross.

## II. *Alpha and Green Cross as Joint Venturers*

Plaintiff argues that even if the evidence does not establish that Alpha was substantially controlled by Green Cross, it does show that Alpha and Green Cross were joint venturers. Plaintiff contends that jurisdiction over one co-venturer, Alpha, is sufficient to establish jurisdiction over the other co-venturer, Green Cross. *Aigner v. Bell Helicopters, Inc.*, 86 F.R.D. 532, 540 (N.D.Ill.1980).

Plaintiff devoted little space to this argument in her briefs, discussing the issue for the first time in her supplemental response to the motion to dismiss. This court concludes that the argument is without merit.

■■■■ "A joint venture is an association of two or more persons to carry out a single enterprise for profit. Whether a joint venture exists is a question of the intent of the parties." *Fitchie v. Yurko*, 212 Ill.App.3d 216, 156 Ill.Dec. 416, 570 N.E.2d 892, 899–900 (1992). In examining the parties' intent, a court should look to the following elements: (1) an agreement, express or implied, to carry on an enterprise; (2) a demonstration of intent by the parties to be joint venturers; (3) a joint interest, as reflected in the contribution of property, finances, effort, skill or knowledge by each party to the joint venture; (4) a measure of proprietorship or joint control over the enterprise; and (5) a provision for sharing of profits or losses. *Id.* at 900.

■■■■ Plaintiff asserts that "Green Cross were co-venturers in the collection of plasma for use in plasma-derived products, and the sale of those products." (Pl's Supp.Resp. at 12.) However, the evidence does not support the finding of an intent to carry out a joint venture. Green Cross created Alpha to ensure that Green Cross would have an adequate supply of plasma, but there is no evidence that the parties intended that Alpha's plasma collection would be part of a joint venture. There is some, though not much, evidence that Green Cross may have contributed some funds to Alpha. In addition, there is evidence that Green Cross and Alpha collaborated on some research and development. However, there is no evidence that they collaborated on any work related to plasma collection. There is some, but again not much, evidence that Green Cross exercises limited control over Alpha, but there is no evidence that Green Cross exerted any control over Alpha's plasma collection activities. There is no evidence of any provision for sharing of profits or losses from the purported joint venture. Indeed, there is no evidence that Green Cross was involved in the collection of plasma by Alpha, and there is no evidence that the sales of plasma from Alpha to Green Cross were anything other than market sales. Plaintiff has not established the existence of a joint venture between Alpha and Green Cross.

## CONCLUSION

The analysis under the various tests outlined above is consistent with notions of due process. Under federal due process standards, a court may exercise personal jurisdiction over a nonresident party if the party has purposely established minimum contacts with the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Here, Green Cross itself has not established minimum contacts with Illinois, the activities of Alpha cannot be attributed to Green Cross, and there is insufficient evidence that Green Cross participated in a joint venture with Alpha in Illinois. Moreover, requiring Green Cross to submit to the jurisdiction of this court would impose a considerable burden on Green Cross. Green Cross is a Japanese company with no office or employees in Illinois. *See Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (noting "severe" burden on Japanese defendant forced to travel long distance and defend itself in foreign legal system).

over the parent, the subsidiary was introducing the parent's products into Illinois. Here, plaintiff is arguing for jurisdiction because the subsidiary, Alpha, is collecting plasma in Illinois and a large percentage of the sales of the plasma is to the parent, Green Cross.

Green Cross does not have sufficient contacts with the State of Illinois to permit this court to exercise jurisdiction over Green Cross. Green Cross is not doing business in Illinois, and the claims do not arise out of a tortious act or a business transaction by Green Cross in Illinois. Alpha has not been shown to be the alter ego of Green Cross, and Green Cross does not substantially control Alpha. Therefore jurisdiction over Alpha is insufficient to establish jurisdiction over Green Cross. Finally, Green Cross and Alpha were not joint venturers. Green Cross' motion to dismiss for lack of personal jurisdiction is granted. The complaint is dismissed as to the defendant Green Cross.