**LASALLE NATIONAL BANK, As Preference Litigation Trustee, Plaintiff,**

v.

**VITRO, SOCIEDAD ANONIMA and Container Holdings Corp., Defendants.**

No. 98 C 8306.

United States District Court, N.D. Illinois, Eastern Division.

Feb. 16, 2000.

James E. Spiotto, Michael T. Benz, Franklin Henry Top, III, Chapman & Cutler, Chicago, IL, for Plaintiff.

William G. Schopf, Jr., Bradley Paul Nelson, Schopf & Weiss, Chicago, IL, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

NORDBERG, Senior District Judge.

This is a diversity action challenging the fairness of the court-approved sale of Anchor Glass Container Corporation ("Anchor"), which was a former indirect subsidiary of defendant Vitro, Sociedad Anonima de Capital Variable ("Vitro"). Vitro has filed a motion to dismiss for lack of personal jurisdiction, pursuant to Fed. R.Civ.P. 12(b)(2), and argues that it is a Mexican holding corporation with no jurisdictionally relevant contacts to Illinois. Plaintiff argues that Vitro is really a "super-corporation" actively controlling a number of U.S. subsidiaries which, together, have enough Illinois contacts to support jurisdiction over their parent corporation. For the reasons set forth below, the motion is granted.

## BACKGROUND

Defendant Vitro is a Mexican corporation headquartered in San Pedro Garza Garcia, Nuevo Leon, Mexico. Vitro is described in the complaint as a "multinational holding company, who through its direct and indirect subsidiaries is a leading manufacturer of glass and household products in 60 countries, worldwide, including the United States." (Am.Cmplt.¶ 4.) Some of these subsidiaries are headquartered in the United States, although none of them is headquartered or incorporated in Illinois. These subsidiaries produce various glass products that allegedly "are marketed and sold to residents of the State of Illinois." (*Id.*) However, Vitro itself does not manufacture any of these products.

Plaintiff—LaSalle Bank N.A., as Preference Litigation Trustee ("LaSalle")—is a national bank headquartered in Chicago. LaSalle serves as a litigation trustee for the holders of certain senior subordinated debentures issued in 1993 by Anchor. In November 1989, Vitro acquired, through a wholly-owned subsidiary, all of the stock of Anchor. Anchor was a Delaware corporation formed in 1983 to manufacture and sell glass containers primarily in the beverage and food industries. Anchor owned approximately 13 glass manufacturing facilities in 11 states. One of those facilities was located in Waukegan, Illinois. In September 1996, Anchor filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware. Thereafter, Anchor was sold to a third party, although much of the negotiations for the sale took place before the bankruptcy filing. The asset sale was approved by the bankruptcy court after two days of hearings in December 1996.

The complaint focuses on that sale and specifically on Vitro's role in managing it. LaSalle alleges that Vitro, as the indirect owner of Anchor, orchestrated the sale in such a way as to benefit Vitro at the expense of the debenture holders. Vitro allegedly manipulated the sale by having the purchaser assume certain debts of Anchor for which Vitro (as the parent) was secondarily liable. These debts included pension and environmental liabilities. The net effect of this arrangement was that the purchaser paid less in cash, which in turn meant that there was a reduced amount of cash to compensate the debenture holders. In other words, certain debts were given preference over others. This preference allegedly violated the debenture holders' contractual rights to be treated equally with the other non-senior debt of Anchor. The debenture holders ultimately received only a small distribution and now ask that Vitro be held responsible for the repayment of the debentures.[1]

On December 24, 1998, LaSalle filed its original complaint here in the Northern District of Illinois. As a basis for jurisdiction over Vitro, LaSalle alleged that Anchor conducted activities in Illinois and that other subsidiaries of Vitro introduced products into the stream of commerce in Illinois. (Cmplt.¶ 7.) Vitro then filed a motion to dismiss, arguing generally that it only had *de minimis* contacts with Illinois, that the contacts of Vitro's subsidiaries should not be imputed to Vitro, and that, even if they were, they were not enough to confer jurisdiction over their parent corporation. In its response brief, LaSalle added additional grounds for jurisdiction and requested permission to take discovery on the jurisdictional question. After Vitro filed its reply, we granted LaSalle 45 days to take discovery on the jurisdictional question. Each party then filed a supplemental brief, and LaSalle filed an amended complaint, which included all of its current grounds for personal jurisdiction.

## DISCUSSION

The parties agree on the basic legal framework to resolve this motion. LaSalle, as the plaintiff, bears the burden of establishing that there is personal jurisdiction over Vitro. *RAR, Inc. v. Turner*

---

1. The face amount of the debentures was approximately $200 million.

*Diesel, Ltd.,* 107 F.3d 1272, 1275–76 (7th Cir.1997). However, this court must resolve any factual disputes in favor of La-Salle. *Id.*

■ Because the federal basis of jurisdiction is diversity, LaSalle must show that the law of the forum state (Illinois) would permit the exercise of jurisdiction over Vitro and that such an exercise would not violate Vitro's constitutional due process rights. *Id.* Because the Illinois long-arm statute allows jurisdiction to be exercised to the extent permitted by due process, these two inquiries essentially collapse into one such that we may focus on the basic question of whether personal jurisdiction is permitted under the federal and state constitutional due process rights. *Id.; see* 735 ILCS 5/2–209.[2]

In *RAR,* the Seventh Circuit provided the following succinct summary of the federal due process standard in this context:

> The Due Process Clause of the Fourteenth Amendment limits when a state may assert in personam jurisdiction over nonresident individuals and corporations. *See Pennoyer v. Neff,* 95 U.S. 714, 733, 24 L.Ed. 565 (1878). A defendant must have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (*quoting Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). What the standard means in a particular case

> depends on whether the state asserts "general" or "specific" jurisdiction. Specific jurisdiction refers to jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). General jurisdiction, meanwhile, is for suits neither arising out of nor related to the defendant's contacts, and it is permitted only where the defendant has "continuous and systematic general business contacts" with the forum. *Id.* at 416, 104 S.Ct. 1868.

107 F.3d at 1277 (parallel citations omitted).

In arguing that there is jurisdiction over Vitro, LaSalle relies on a number of disparate facts and legal theories. In particular, LaSalle relies not only on contacts of Vitro itself, but also on the contacts of Vitro's subsidiaries. LaSalle also argues that there is a basis for both specific and general personal jurisdiction. We first discuss the argument for specific jurisdiction, which (in our opinion) is the weaker of the two arguments, and then turn to general jurisdiction.[3]

**I. Specific Jurisdiction.**

■ The argument for specific jurisdiction is undoubtedly appealing to LaSalle because the degree of contact required is lower than that for general jurisdiction, which requires continuous and systematic general business contacts. *Helicopteros,*

---

2. Because the parties have not raised any arguments uniquely based on the Illinois Constitution, we will analyze the due process question solely under the federal standards. *See Michael J. Neuman & Assocs. v. Florabelle Flowers, Inc.,* 15 F.3d 721, 725 (7th Cir.1994).

3. In the introductory portion of its most recent brief, Vitro has raised the concern that LaSalle is—in Vitro's words—engaged in "blatant forum-shopping." Vitro bases this charge on the fact that the Delaware bankruptcy court held two days of hearings and ultimately approved of the sale of Anchor's assets. The debenture holders apparently

could have raised their current objections with the Delaware bankruptcy court. Vitro thus concludes that, by waiting to assert its claims here in Illinois before a court not familiar with the underlying facts, LaSalle is seeking a tactical advantage. While it does appear that the Delaware court would have been the more logical court to consider this suit, we have not considered this "argument" in our analysis because Vitro has made no attempt to link it up to any particular legal doctrine or factor in the jurisdictional analysis.

466 U.S. at 416, 104 S.Ct. 1868. As noted above, there is a catch. The claims in the complaint must relate to, or arise out of, the contacts with the forum. Vitro argues that LaSalle cannot meet this latter requirement. LaSalle argues that the claims do arise out of certain Illinois contacts. Specifically, Anchor—Vitro's former indirect subsidiary—had a manufacturing plant in Waukegan, Illinois, and that plant was responsible for some of the debts that later were assumed by the purchaser in the court-approved sale.

We do not find this argument persuasive. It rests on a skewed interpretation of the complaint. In order to make the argument work, LaSalle implies that its current claims relate to the specific debts in Illinois. If true, you would expect that the complaint would discuss some of the details and facts concerning such debts. Yet, as we read the complaint, it focuses solely on how those debts were later treated in the sale (*i.e.*, why did the purchaser assume those debts rather than paying cash?) and does not hinge on anything unique to those debts. In its supplemental response brief, LaSalle seems to recognize this point when it states that this case "centers around ... the manner in which Anchor's assets were managed, marketed and sold in Anchor's bankruptcy proceeding." (LaSalle Am.Resp. at 3.) In other words, the whole focus of the complaint is on the negotiations and sale of Anchor. LaSalle has not disputed Vitro's assertion that these activities took place either in New York or Delaware. Indisputably, these activities did not take place in Illinois.

In sum, LaSalle's argument is too attenuated. As the Seventh Circuit stated in *RAR*, the fact that a suit—"in a certain

sense"—is related to the forum contacts is not enough. "We do not think [ ] that using such a loose causal connection between a suit and a defendant's forum contacts as the basis for personal jurisdiction comports with fair play and substantial justice." 107 F.3d at 1278. Here, the alleged connection is (at best) such a "loose causal connection." *Id.*

## II. General Jurisdiction.

■ We now address the argument for general jurisdiction. As noted above, general jurisdiction requires continuous and systematic general business contacts with the forum state. *Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868. As one court stated, these contacts must be "extensive and persuasive." *Reliance Steel Prods. v. Watson, Ess, Marshall,* 675 F.2d 587, 589 (3d Cir. 1982) (a case cited by LaSalle). Both parties recognize that this question is a fact-specific inquiry that cannot be reduced to any rote formula. In this case, there is additional layer of analysis. LaSalle not only argues that Vitro itself has contacts sufficient to confer jurisdiction, but also that Vitro's U.S. subsidiaries also have contacts, which should be imputed to Vitro. We examine each argument in turn.

### A. Vitro's Direct Contacts.

■ The only direct basis for finding jurisdiction over Vitro (*i.e.* without relying on the contacts of its subsidiaries) is Vitro's operation of a website accessible by Illinois residents.[4] LaSalle argues that, under appropriate circumstances, internet activity may be sufficient to establish personal jurisdiction.

Not surprisingly, in light of the explosion of websites, courts have started to grapple with this issue. Although the Sev-

---

**4.** LaSalle also argues that Vitro's representatives planned to attend an International Housewares Show at McCormick Place in Chicago. Vitro points out, however, that Vitrocrisa, a subsidiary, actually attended the show—not Vitro. In any event, we do not find that mere attendance at an international trade show is a significant fact when consid-

ering whether a corporation had a systematic and continuous presence in a forum. *See, e.g., International Fin. Servs. Corp. v. Ross Indus.,* 1991 WL 36726, *3 (N.D.Ill. March 15, 1991) (general personal jurisdiction not justified based on minor sales and attendance at a trade show "aimed at a national audience").

enth Circuit has not yet addressed this issue, a number of courts have categorized websites into one of three kinds for purposes of personal jurisdiction. First, there are certain active websites that clearly can be used to invoke personal jurisdiction. *International Star Registry of Illinois v. Bowman–Haight Ventures, Inc.*, 1999 WL 300285, *4 (N.D.Ill. May 6, 1999) (J. Hart). An example of such a site is one in which the company actively sells its products directly over the internet. Second, there are passive sites where the defendant merely posts information on the internet. These types are clearly not enough to establish personal jurisdiction. *Id.* at *4–5. Third, there are websites that do not allow direct sales but that do allow the user to exchange information with the host computer. Such sites do suffice to establish personal jurisdiction, especially where the latter component is present. *Id.*

LaSalle argues that Vitro's web-site is "interactive" and therefore falls within this third category. It points out that the website has the following features: (1) an e-mail button to obtain financial information on Vitro; (2) an e-mail button for members of the media; (3) a customer service page that allows a person (with an appropriate identification and password) to directly interact electronically with customer service representatives; (4) access to on-line catalogs of Vitro's products; and (5) a list of "contact" persons (with e-mail addresses) for further information on these products.

Although the above features do evidence a minimal level of "interactivity," there is no interactivity with action taken by Vitro as a result of individual communication. Rather, the Vitro website is a passive website in category two, which is not enough to confer jurisdiction. As an initial point, there is no suggestion that Vitro is using the website to sell products directly over the internet. In addition, the website describes itself as "a resource for customers, investors and others interested in the company." (LaSalle Am.Resp. at 13.) The following quotation taken from the website confirms this point:

> We hope this site will tell you more about our: 1) various businesses and the markets we serve; 2) facilities in seven countries, including Mexico and the United States; 3) associations and strategic alliances with other corporations around the world.

*Id.* A website set up as a resource for telling customers more about a company is a passive website. *Cf. Resuscitation Technologies, Inc. v. Continental Health Care Corp.*, 1997 WL 148567, *5–6 (S.D.Ind. March 24, 1997) (an initial internet solicitation led to "numerous and continuous" email messages "over a period of months"); *Maritz, Inc. v. Cybergold, Inc.*, 947 F.Supp. 1328, 1330 (E.D.Mo.1996) (internet users are added to a mailing list and are given their own electronic mailbox).[5]

Vitro raises an even stronger argument. It points out that the all of the cases relied upon by LaSalle considered whether operation of a website conferred *specific* and not *general* jurisdiction. As we have concluded above, there is no basis for specific jurisdiction here, and therefore LaSalle must meet a higher threshold of contacts to establish general jurisdiction. We do not think the type of website described here is enough to meet that rigorous standard. In fact, Vitro states that (to its knowledge) *no* court has ever found general jurisdiction based on the operation of a web site that does not provide for direct sales. LaSalle has not provided any cases to dispute this assertion. *See Molnlycke Health Care AB v. Dumex Medical Surgi-*

---

5. Also, there is no suggestion here that the website is specifically targeted to Illinois residents. The most that LaSalle can say is that it is targeted to the Western Hemisphere, which happens to include Illinois. *See Molnlycke Health Care AB v. Dumex Medical Surgical Products, Ltd.*, 64 F.Supp.2d 448, 452 (E.D.Pa.1999) ("while [plaintiff's] websites are available in every state, they are not necessarily targeted towards every state. Plaintiff has made no showing that defendant's websites targeted Pennsylvania."); *but see International Star Registry*, 1999 WL 300285 at *6.

*cal Products Ltd.*, 64 F.Supp.2d 448, 451 (E.D.Pa.1999) (rejecting the argument that there was general jurisdiction based on the operation of a website: "[t]o hold that the possibility of ordering products from a website establishes general jurisdiction would effectively hold that any corporation with such a website is subject to general jurisdiction in every state. The court is not willing to take such a step."); *IDS Life Ins. Co. v. SunAmerica, Inc.*, 958 F.Supp. 1258, 1268 (N.D.Ill.1997) ("Plaintiffs ask this court to hold that any defendant who advertises nationally or on the Internet is subject to its jurisdiction. It cannot plausibly be argued that any defendant who advertises nationally could expect to be haled into court in any state, *for a cause of action that does not relate to the advertisements*.") (emphasis added), *aff'd in part, vacated in part on other grounds*, 136 F.3d 537 (7th Cir.1998).

### B. Vitro's Subsidiaries Contacts.

We finally turn to what may be La-Salle's best argument. It argues that Vitro has a number of U.S. subsidiaries that collectively have sufficient contacts with Illinois to justify jurisdiction over Vitro. This argument must overcome two hurdles. First, in order to rely on contacts of the subsidiaries, LaSalle faces an initial hurdle of showing that it is appropriate to impute the acts of the subsidiary to the parent. Second, LaSalle must show that there are sufficient contacts on the part of these subsidiaries to justify jurisdiction over them and thus, by extension, over Vitro. Vitro argues that LaSalle cannot meet either of these two separate requirements. We will first address the question of the subsidiaries contacts, and then will turn to the former question of whether it is appropriate to attribute those acts to the parent corporation.

### 1. Jurisdictional Contacts Of Vitro's Subsidiaries.

█ LaSalle relies on two main arguments for concluding that Vitro's subsid-

iaries themselves have sufficient contacts to establish general jurisdiction over them.

In its original complaint, LaSalle focused primarily on the activities of one particular subsidiary—namely, Anchor. LaSalle argued that general jurisdiction over Anchor existed based on the fact that Anchor owned a manufacturing plant located in Waukegan, Illinois. In response to this argument, Vitro pointed out that this plant was closed in the first seven months of 1995 and sold in May, 1996.[6] LaSalle filed this complaint in December of 1998— more than two and a half years after the plant was sold and more than three years after it was closed. Vitro argues that this contact is not relevant because general jurisdiction only considers those contacts that exist at the time of the filing of the complaint.

To support this latter proposition, Vitro relies on *Reeves v. The Baltimore & Ohio Railroad Co.*, 171 Ill.App.3d 1021, 122 Ill. Dec. 145, 526 N.E.2d 404 (1988), in which the Illinois Appellate court stated that the "focus, for jurisdictional purposes, must [ ] necessarily be upon the time the nonresident defendant became a party to the suit or was served with process." *Id.* at 408, 122 Ill.Dec. 145. The rationale is that a corporation should be able to plan its activities and should be able "alleviate the risk of burdensome litigation by ... severing its connection with the [forum] State." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). At the same time, as pointed out by the Seventh Circuit in *Michael J. Neuman & Assocs. v. Florabelle Flowers, Inc.*, 15 F.3d 721, 724 (7th Cir. 1994), the Illinois appellate court in *Reeves* did not say that the *sole* focus should be on the time of the filing of the complaint, just that the *critical* focus should be. *See Reeves*, 122 Ill.Dec. 145, 526 N.E.2d at 408 ("Although we find that the court should review contacts over this entire period, we note that the critical point of the focus of

---

**6.** The business assets and operations of An-

chor were sold in February 1997.

inquiry must be upon the time that the defendant is made a party to the suit and is served with process.").

Applying this standard, we find that Anchor's contacts are not enough for general jurisdiction. Although we have considered the existence of the Waukegan plant, we do not think that it is enough given that the plant ceased operations more three years before the filing of the complaint.

Rather than focus on the contacts of Anchor, as it did in its initial complaint, LaSalle has cast a wider net and now relies on the contacts of nine other subsidiaries of Vitro. In this second argument, LaSalle asserts that the nine subsidiaries produced products that were ultimately sold to Illinois residents.[7] Based on information obtained in discovery, LaSalle asserts that these nine subsidiaries had a combined 1998 sales to "destinations in Illinois" of approximately $6 million.[8]

Vitro argues that this amount of sales is *de minimus*. At first glance, six million in sales does not seem *de minimis*, as courts have found personal jurisdiction based on a smaller amount of sales in the forum. *See, e.g., Deere & Co. v. Howard Price Turf Equip., Inc.*, 1999 WL 1101215, *3 (N.D.Ill.Dec.1, 1999) (personal jurisdiction existed "where Defendant derived over 5.5% of its annual revenues from Illinois (approximately $400,000 of its total annual sales of $7–7.5 million)").

To fully address this argument, it would be helpful to know what percentage the Illinois sales are of the total sales by these subsidiaries. Neither party has provided such information. There is also a legal question lurking here. Vitro suggests that it is not proper in this type of situation to aggregate the contacts of the different subsidiaries. Neither party has directed us to any case law on this issue. Fortunately, we need not definitively decide this point because, even assuming that the contacts may be aggregated and that they are significant, there are not grounds for imputing these contacts to Vitro.

## 2. Jurisdiction Over A Parent Based On Contacts Of Subsidiaries.

Our analysis begins with the general rule (cited by Vitro) that "[j]urisdiction over a subsidiary is not sufficient to confer jurisdiction over an out-of-state parent." *Gruca v. Alpha Therapeutic Corp.*, 19 F.Supp.2d 862, 864–65 (N.D.Ill.1998). Of course, there is an exception to this rule. If the parent sufficiently controls the subsidiary, then courts will impute the acts of the subsidiary to the parent. Yet, the general rule assumes that there will be some control in the normal parent/subsidiary relationship. *See generally IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir.1998) ("[p]arents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some extent"). The problem thus faced by courts is determining just how much control is enough to fall within the exception.

As described more fully in *Gruca*, Illinois utilizes two approaches in determining how much control is enough. 19 F.Supp.2d at 866. The first approach is the traditional test for piercing the corporate veil. In this case, the facts do not meet this test. *See id.* There is no evidence that any of Vitro's subsidiaries failed to comply with corporate formalities or were undercapitalized. LaSalle concedes that the subsidiaries issued their own financial statements.

Of course, as LaSalle points out, there is a difference between finding a parent susceptible to jurisdiction in a given forum versus finding such parent liable for the debts of its subsidiary. For this reason,

---

7. Of course, none of these subsidiaries is located or currently has offices in Illinois. Some of them apparently sold their products through a joint venture and marketing relationship with Libbey, Inc.

8. The bulk of these sales are from two of the subsidiaries: (i) Super Sky—$3,357,253; and (ii) VVP America—$2,221,774.

the second approach is more flexible and simply asks whether the parent has substantially controlled the subsidiary. In other words, the degree of control required is less than that needed to meet the traditional test for piercing the corporate veil. Again, how much control needed is hard to state with any precision. As set forth in *Gruca*, courts have considered a number of factors, which include whether the parent arranged financing for the subsidiary, whether separate books, tax returns and financial statements are kept, and whether the officers or directors are the same. *Id.* at 866–67.

LaSalle generally asserts that Vitro is a "super-corporation" that actively controls its subsidiaries. LaSalle specifically relies on a number of facts to support this claim. For purposes of our analysis, these facts fall into two basic categories.

The first category consists of facts tending to show that Vitro "represented" itself as one larger super corporation. LaSalle says that Vitro made representations to this effect on its website and in various public filings. For example, LaSalle points to the following statement on the website:

> Grupo Vitro produces glass containers, flat glass, automotive glass, glassware, plastic containers, aluminum cans and household appliances.
>
> Vitro supplies numerous industries, including automotive, containers, construction, household and industrial products.
>
> Based in Monterey, Mexico, and founded in 1909, Grupo Vitro has strategic alliances with fifteen international corporations around the world. Vitro operates more than 100 facilities in seven countries, including Mexico and the United States, and exports products to more than 70 countries worldwide.

(LaSalle Am.Resp. at 4.) In addition, Vitro's legal counsel once wrote a letter to the Pension Benefit Guaranty Corporation, in which he stated as follows:

> Finally, most of Vitro's U.S. subsidiaries are essentially sales outlets for Vitro's products in the United States. Without Vitro's continuing supply of product, they have no going concern value.

(*Id.* at 4–5.)

Vitro argues that these facts are largely irrelevant because they only go to how the corporation portrays itself and are not evidence of how the corporation actually operates. Vitro claims that there is no legal authority for basing personal jurisdiction over a parent based on how the corporation represents itself in public statements. Vitro asserts that the only situation in which these facts are relevant is in the context of the "apparent manufacturer" doctrine, which Illinois courts have applied on occasion in product liability cases. *See, e.g., Root v. JH Indus. Inc.*, 277 Ill.App.3d 502, 214 Ill.Dec. 4, 660 N.E.2d 195 (1995); *Hebel v. Sherman Equip.*, 92 Ill.2d 368, 65 Ill.Dec. 888, 442 N.E.2d 199 (1982). Vitro says that this doctrine is not applicable here because there is no suggestion whatsoever that the debenture holders were acting on a mistaken belief about Vitro's corporate structure.

We agree with Vitro's argument. Personal jurisdiction is based on actual evidence of control (aside from the "apparent manufacturer" context) rather than on a corporation's general descriptions. Promotional statements made on a public website do not precisely convey the operative corporate structure. Many of the statements on Vitro's website are so general that they do not really provide evidence of what control Vitro has over its subsidiaries.

The second category consists of facts relating more directly to the actual relationship between Vitro and its subsidiaries. LaSalle relies on the following specific factors: (i) Vitro conducts its business through divisions; (ii) Vitro reports its finances on a consolidated basis by division; (iii) there is director and officer overlap between Vitro and its subsidiaries; (iv) Vitro has a comprehensive business plan

for all of its businesses; and (v) Vitro provides training to its employees.

The fact that Vitro conducts its business through divisions, offers training to employees of its subsidiaries, and has a comprehensive business plan is consistent with the normal relationship between a parent and subsidiary, in which parent corporations may "control, direct, and supervise the subsidiaries to some extent". *IDS*, 136 F.3d at 540. The argument that there is a "significant overlap" in officers and directors does suggest the possibility of control. In this case, however, this factor alone is not enough to take this case out from the general rule that a subsidiary's contacts with a forum should not be used to obtain personal jurisdiction over the non-resident parent corporation. *See, e.g., Gruca*, 19 F.Supp.2d at 870 ("While such [director] overlap provides some evidence of control (or at least the potential for control), on its own it is not sufficient."); *Integrated Business Info. Serv. (Proprietary) Ltd. v. Dun & Bradstreet Corp.*, 714 F.Supp. 296, 300 (N.D.Ill.1989) (no personal jurisdiction even though there was an overlap of directors and executives).

Ultimately, we agree with Vitro when it points out that there is no evidence here that Vitro took active, day-to-day control over any of its subsidiaries. Absence of daily control is one factor that courts have found important to the analysis. *See, e.g., Gruca*, 19 F.Supp.2d at 870 ("there is little evidence that the officers at [the parent corporation] exerted substantial control over the [subsidiary], and in particular, over the 'daily affairs' of the subsidiary").[9]

The closest LaSalle comes to alleging active, day-to-day control is when it alleges that Vitro actively took control over Anchor in December of 1995 and began to try to sell the company. Even assuming these allegations were enough to show substantial control over Anchor, LaSalle still could not prevail. As discussed above, LaSalle is proceeding under an aggregation theory. Therefore, LaSalle should have to show that Vitro substantially controlled all of these subsidiaries and not just Anchor. Other than director and officer overlap, there are no specific allegations directed to the nine other subsidiaries that sold products in Illinois.

In conclusion, for all of the above reasons, we find that there is no personal jurisdiction over Vitro.

### CONCLUSION

For the foregoing reasons, this court grants defendant Vitro's motion to dismiss and hereby dismisses Vitro from this action without prejudice.

---

9. LaSalle relies heavily on *In re Telectronics Pacing Systems*, 953 F.Supp. 909 (S.D.Ohio 1997), in which the Ohio district court concluded that there was personal jurisdiction over an Australian parent corporation based on its control over a U.S. subsidiary. In coming to this conclusion, however, the Ohio court noted (among other things) that the officials of the parent "participated in the day-to-day operations" of the subsidiary. *Id.* at 921.